UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-14067-MATTHEWMAN

JASON IBARRA,

     Plaintiff,

vs.

FUTURE MOTION, INC.,

     Defendant.

_____/

FILED BY _____ SW _____ D.C.

May 2, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

## AMENDED[1] ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE 52]

**THIS CAUSE** is before the Court upon Defendant, Future Motion, Inc.'s ("Defendant" or "Future Motion") Motion for Summary Judgment ("Motion") [DE 52] and Statement of Undisputed Material Facts Filed in Support of Motion for Summary Judgment [DE 53]. Plaintiff, Jason Ibarra ("Plaintiff") has filed a Response to Defendant's Motion [DE 70] and an "Opponent Statement of Undisputed Material Facts Filed in Opposition to Defendant's Motion for Summary Judgment" [DE 79]. Defendant, in turn, has filed a Reply [DE 85] and a Reply Statement of Material Facts [DE 87]. Further, the Court held a hearing on the Motion on April 6, 2023, via Zoom Video teleconference. Thus, the matter is now ripe for review, and the Court has carefully

---

[1] The Court's Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment ("Order") [DE 101] is hereby amended to clarify one sentence on page 29. Specifically, on page 29 of that Order, the Court stated that "Defendant's Motion for Summary Judgment is due to be denied as to all claims sounding in negligence." [DE 101 at 29]. However, on that same page, the Court further stated that "Defendant's Motion for Summary Judgment is **GRANTED** as to Counts I and II with respect to Plaintiff's strict liability and negligence claims based on a manufacturing defect." [DE 101 at 29]. For purposes of clarification, the later language is correct. *See* p. 29 of this Amended Order, *infra*.

1

considered the filings and attachments thereto, argument of counsel, and the entire docket in this case.

## I.     THE COMPLAINT [DE 1-2]

Plaintiff's Complaint and Demand for Jury Trial ("Complaint") [DE 1-2 at 5–17] contains two counts against Defendant: Negligence (Count I) and Strict Liability (Count II). *See* Compl., DE 1-2 at 10–16. As to Count I, Plaintiff alleges fifteen different ways that Defendant breached the duty of care owed him to him. [DE 1-2 at 10–12]. With respect to Count II, Plaintiff lists fourteen different ways in which the Onewheel+ device—from which he fell and sustained injury—was unreasonably dangerous and defective. *Id.* at 13–15.

## II.     UNDISPUTED FACTS

The following facts are drawn from the uncontested portions of the record together with Defendant's Statement of Undisputed Material Facts ("SMF") [DE 53], Plaintiff's "Opponent Statement of Undisputed Material Facts Filed in Opposition to Defendant's Motion for Summary Judgment" ("Response SMF") [DE 79], and Defendant's Reply Statement of Material Facts ("Reply SMF") [DE 87].

### a.   The Incident

This lawsuit arises from an alleged February 12, 2021 incident in which Plaintiff contends he fell while riding his Onewheel+ electric skateboard in Martin County, Florida.[2] [Def.'s SMF ¶ 1]. Defendant Future Motion, Inc. is the creator and manufacturer of the Onewheel+ at issue in the instant case. [Def.'s SMF ¶ 2].

---

[2] Unless otherwise denoted, Onewheel+ is used to describe the specific Onewheel+ involved in Plaintiff's incident. At times, the parties refer to the specific Onewheel+ as the Subject Onewheel.

As to the incident in particular, Plaintiff became interested in Onewheel products, including the Onewheel+ model, after watching Defendant's promotional videos, which conveyed to him a sense of freedom that comes with Onewheel products and a specific lifestyle. [Pl.'s Resp. SMF ¶ 75]. Accordingly, Plaintiff purchased his Onewheel+ secondhand via Facebook Marketplace approximately one month prior to the incident. [Def.'s SMF ¶ 35]. From that point, the Onewheel+ was Plaintiff's "go-to" board, and he used it nearly every day until the date of his injury. [Def.'s SMF ¶ 36].

On that date, an individual came to Plaintiff's home to look at scuba gear Plaintiff had listed for sale. [Def.'s SMF ¶ 37]. While there—and while the two men were in Plaintiff's garage looking at the scuba equipment—the man asked Plaintiff about the Onewheel+. [Def.'s SMF ¶ 38]. Plaintiff offered to show the man the Onewheel+. [Def.'s SMF ¶ 39]. Therefore, Plaintiff unplugged the Onewheel+, put on a helmet, and intended to do a quick ride around his neighborhood to show what a Onewheel+ could do. [Def.'s SMF ¶¶ 39–40].

When exiting the garage, Plaintiff traveled approximately 20 feet from the back of the garage diagonally towards the front, accelerating "quickly" across the garage. [Def.'s SMF ¶¶ 42–43]. However, Plaintiff either fell right at the edge of his garage or just before exiting.[3] *See* Def.'s SMF ¶ 45; Pl.'s Resp. SMF ¶ 45. Plaintiff claims that when he fell from the board, he landed approximately one to two feet in front of the board, which did not move after he fell off. [Def.'s SMF ¶ 46]. In other words, Plaintiff's body landed in the driveway, while the board remained in the garage. [Def.'s SMF ¶ 47].

---

[3] Notably, the surface of Plaintiff's garage floor is concrete, while his driveway consists of pavers. [Def.'s SMF ¶ 44].

The board did not feel unusual to Plaintiff in any way leading up to the moment he fell, and it engaged as expected when he got on. [Def.'s SMF ¶ 48]. Indeed, Plaintiff does not know why the board stopped on February 12, 2021. [Def.'s SMF ¶ 49]. Regardless, after he fell, Plaintiff got up and felt there was something wrong with his wrist. [Def.'s SMF ¶ 51]. Consequently, because Plaintiff felt he needed medical attention, he asked the man picking up the scuba equipment to drive him to the hospital, to which the man agreed. [Def.'s SMF ¶ 52]. Plaintiff claims not to know the name of the man, does not have his phone number or email address, and does not maintain any communication with him. [Def.'s SMF ¶ 41].

Plaintiff later sued Future Motion in November 2021, alleging causes of action for negligence and strict liability. [Def.'s SMF ¶ 56]. In answers to Future Motion's first set of discovery, Plaintiff never identified any defectively manufactured component of his Onewheel+. [Def.'s SMF ¶ 57]. He claimed only that the Onewheel+ was "unreasonably dangerous and defective . . . ." [Def.'s SMF ¶ 58].

   b.  <u>General Background and Warnings</u>

The Onewheel+ is generally comprised of a motor, battery, footpads, and electronic components that allow it to self-balance, and the Onewheel+'s microcontroller keeps track of the state of sensors, battery, and motor. [Def.'s SMF ¶ 3; Pl.'s Resp. SMF ¶ 68]. In order to operate the Onewheel+, a rider stands sideways on the board, as one would stand on a traditional skateboard. [Def.'s SMF ¶ 5]. To move the board forward, a rider leans forward. [Def.'s SMF ¶ 6]. To slow down or stop, a rider leans back. [Def.'s SMF ¶ 7]. In this regard, the board is fully rider activated and the rider controls how fast or slow they are going. [Def.'s SMF ¶ 8]. Like most recreational activities, a learning curve is involved in operating the Onewheel+, and it takes time to become proficient or to transition to a higher skill level. [Def.'s SMF ¶ 9].

4

The user (or owner's) manual for the Onewheel+ describes situations where loss of control is possible, such as low-battery, full-battery while riding downhill, exceeding speed limitations, or riding down too steep of a hill, with nose-down ground contact as the consequence. [Pl.'s Resp. SMF ¶ 69]. The owner's manual for the Onewheel+ (which is available online) also contains many warnings about the Onewheel+ board and how to use it, and warnings about the board's "pushback" feature. [Def.'s SMF ¶¶ 26–27]. This includes the following warnings: (1) that, if at any time a rider attempts to go too fast, descends a very steep hill, or rides with a low battery, the Onewheel+ will "push back"; (2) that, in a situation where the board "pushes back," the nose of the board will lift to slow the rider down, after which the only way of avoiding so-called "pushback" is for the rider to decrease his or her speed by leaning back; and (3) that ignoring safety warnings—including warnings concerning pushback—may result in loss of control, serious injury, or death. [Def.'s SMF ¶ 26].

Plaintiff testified he was familiar with the "risk of death or serious injury" warning in the Onewheel+ owner's manual and that he had read it in multiple manuals prior to the February 12, 2021 incident. [Def.'s SMF ¶ 28]. In fact, Plaintiff looked at the owner's manuals for all the Onewheel boards he owned, including the Onewheel Pint and the Onewheel+ XR. [Def.'s SMF ¶ 25]. Plaintiff understood that the Onewheel+ has limits, that pushback occurs when approaching those limits, and that ignoring related safety warnings could result in serious injury or death. [Def.'s SMF ¶ 30]. Further, Plaintiff understood that if he did not follow the instructions and warnings provided by Future Motion, he could get hurt. [Def.'s SMF ¶ 31].

Beyond looking at the owner's manual for the Onewheel+, Plaintiff also viewed instructional videos concerning operation of the Onewheel+ in the Onewheel mobile app. [Def.'s SMF ¶ 20]. Plaintiff watched all the safety and warning videos in the Onewheel app multiple times.

[Def.'s SMF ¶ 22]. Among these videos, Plaintiff specifically recalled viewing the video on the "pushback" feature. [Def.'s SMF ¶ 21]. As a result, Plaintiff agreed that Future Motion had provided him with safety and operation information via the owner's manual and that Future Motion had provided him with access to plenty of information through the Onewheel app. [Def.'s SMF ¶¶ 23–24].

Defendant has chosen to use pushback as the only feedback/warning provided directly from the Onewheel+ device itself to the user while in operation. [Pl.'s Resp. SMF ¶ 71]. Nonetheless, prior to February 12, 2021, Plaintiff was comfortable riding the Onewheel+, used the Onewheel+ nearly every day, and did not have any questions about how to operate it. [Def.'s SMF ¶¶ 32, 83]. Plaintiff was also comfortable with (and understood) how the Onewheel+ accelerated, decelerated, and stopped. [Def.'s SMF ¶¶ 33, 84]. Indeed, Plaintiff specifically understood that if a rider puts too much weight forward, he could "put down" the nose of the board which could cause abrupt stops due to the friction of the board against the ground. [Def.'s SMF ¶ 34; Pl.'s Resp. SMF ¶ 74; Reply SMF ¶ 74].

Plaintiff also understood the Onewheel+ had limits in terms of speed and battery capacity (which he testified he respected), and that nosedives happen when a rider pushes through pushback. [Pl.'s Resp. SMF ¶¶ 87, 89–90]. However, Plaintiff was not going downhill with a full battery, ascending a steep hill, or riding with a low battery when he fell. [Pl.'s Resp. SMF ¶ 76; Reply SMF ¶ 76]. And, other than the incident at issue, Plaintiff never experienced a nose-down event while riding the Onewheel+ because he did not want to go too fast and reach the point of pushback. [Pl.'s Resp. SMF ¶ 91].

c. Design and Testing

6

During the manufacture and assembly process, Future Motion subjects each board to numerous tests involving the board itself, and the board's component parts and systems. [Def.'s SMF ¶ 10]. The tests performed by Future Motion on each board, including Plaintiff's Onewheel+, are documented in the Full Unit Report. [Def.'s SMF ¶ 12]. Future Motion tested Plaintiff's board before it was shipped to its original purchaser. [Def.'s SMF ¶ 13]. Plaintiff's board passed every single test, including a post-assembly test ride. [Def.'s SMF ¶ 14]. Moreover, Plaintiff made no warranty claim, never returned the Onewheel+ to Future Motion for repairs, never reported the February 12, 2021 incident, and never contacted Future Motion to report problems with the Onewheel+ or any of his other Onewheel boards. [Def.'s SMF ¶ 15].

Plaintiff did not charge the board after the incident, but a few months after the incident, his wife was able to turn it on and ride it with no issues. [Def.'s SMF ¶ 50]. In fact, on May 12, 2022, Future Motion employee John "Jack" Mudd performed a test ride of Plaintiff's Onewheel+. [Def.'s SMF ¶ 62]. When Mr. Mudd test rode the board, he connected the board to his mobile application and noted that the board had been ridden for 409 miles and connected in "Elevated" mode. [Def.'s SMF ¶ 63]. Like Plaintiff's wife, Mr. Mudd experienced no problems with Plaintiff's Onewheel+ during the test ride, wherein Mr. Mudd rode the board a total of two miles, rode the board in all four modes, and noted that he felt pushback in every mode. [Def.'s SMF ¶¶ 64–65].

The Failure Modes and Effects Analysis ("FMEA") is used in product design and is meant to systematically link, rank, classify, and assess failures according to their effect on mission success and the safety of personnel and equipment. [Pl.'s Resp. SMF ¶ 79]. Plaintiff's experts explain that, pursuant to the FMEA, once hazards or risks are known, the first and most desirable method in controlling the risk should be to design it out, the second method is to guard against the

hazard—but only if the first method (designing it out) is deemed unfeasible—and the last method is to educate the user against the hazard. [Pl.'s Resp. SMF ¶ 80].

Kyle Doerksen (the founder and CEO of Defendant Future Motion) testified that he was familiar with the FMEA, and that the FMEA was implemented during the design phase of the Onewheel+. [Pl.'s Resp. SMF ¶ 81]. However, Mr. Doerksen further testified that there are failures that could happen in the electronics of the Onewheel+, which could cause hazards. [Pl.'s Resp. SMF ¶ 82].

    d.  <u>Facebook Posts</u>

In March of 2021, Plaintiff posted about the incident on Facebook. [Def.'s SMF ¶ 53]. In response to one comment, Plaintiff stated: "yeah, I'm always ready to tuck and roll when on a ride. In this case was just moving it from the back of the garage to the front and a little bit too quickly, wasn't mentally prepared for it and the whole 'ride' lasted all of 30 feet." [Def.'s SMF ¶ 53]. In the same string of comments to his post about the incident, Plaintiff also stated: "Six months later, the owner of 5 OneWheels, and I rode one from the back of the garage to the front, just to move it and ate shit without wrist guards. FML." [Def.'s SMF ¶ 54]. Further, in response to being asked what caused his fall, Plaintiff wrote "I forget it was on the low-speed setting for my kids and I quickly hit top speed. I think the nose pushed up/back and I didn't have time to react, so I basically tripped over the front foot pad." [Def.'s SMF ¶ 55]. Despite such comments, Plaintiff testified that his posts made to various Onewheel groups on Facebook were not accurate. [Pl.'s Resp. SMF ¶ 92].

## III.    <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(a) states in relevant part that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on

which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of demonstrating to the court by reference to the record that there are no genuine issues of material fact that need to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a moving party has discharged its initial burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," identify specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and quotations omitted). Any doubts regarding whether a trial is necessary must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

So long as the non-moving party has had an ample opportunity to conduct discovery, the non-movant must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50.

## IV.    MOTION, RESPONSE, AND REPLY

a. The Motion Itself [DE 52]

In Defendant's Motion for Summary Judgment, Defendant summarizes its argument as follows:

> On February 12, 2021, Plaintiff Jason Ibarra was riding a Onewheel+ electric skateboard—which was designed and manufactured by Defendant Future Motion—when he fell from the board and broke his wrist. Plaintiff alleges that his Onewheel+ is defective in design, manufacture, and/or warnings, and/or that Future Motion was negligent. Because the proposed opinions of Plaintiff's experts are unreliable, inadmissible, and legally inadequate, Plaintiff cannot show either an unreasonably dangerous condition in the subject Onewheel+ nor demonstrate the requisite causal link. Expert evidence of a defect, breach of duty, and causation is necessary for Plaintiff to prevail on all causes of action he asserted. Moreover, Plaintiff could not identify a single warning that he thinks would have prevented this incident. It would be pure speculation for a finder of fact to conclude that Plaintiff's accident resulted from a defect in his board, rather than his own operation of the board that day.

[DE 52 at 1–2]. Subsequently, after pointing out that Defendant's wife rode the Onewheel+ following the incident with no issues—and that a Future Motion employee also test rode the board with no apparent issues—Defendant argues that Plaintiff's strict liability and negligence claims fail as a matter of law. *Id.* at 3–4.

Specifically, as to strict liability, Defendant contends that "[i]n order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." *Id.* at 4–5 (quoting *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976)). Accordingly, Defendant argues that: (1) Plaintiff lacks admissible expert evidence to prove a defect exists in the Onewheel+; (2) Plaintiff cannot establish a design defect; (3) Plaintiff cannot

establish a warning defect; (4) Plaintiff cannot establish a manufacturing defect; and (5) Plaintiff

cannot establish that any alleged defect was the proximate cause of Plaintiff's injury. *Id.* at 5–12.

First, with respect its argument concerning a lack of admissible expert evidence, Defendant

contends that under well-established Florida law, expert testimony is generally necessary to prove

that a product is defective. *Id.* at 5. In this regard, Defendant contends that Plaintiff has failed to

produce admissible expert evidence demonstrating a product defect. *Id.* Indeed, according to

Defendant, "Plaintiff's experts lack appropriate qualifications to opine on source code, and lack

scientifically valid, admissible evidence to support their opinions." *Id.* at 5–6.

Second, as to its argument that Plaintiff cannot establish a design defect, Defendant notes

that Florida "has adopted both the consumer expectation test and risk utility test as alternative

bases for proving a design defect." *Id.* at 6–7. Under the consumer expectations test, "a product is

considered to be defective where the product is, at the time it leaves the seller's hands, in a

condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to

the consumer." *Id.* (alteration and internal quotation marks omitted) (quoting *Cavanaugh v. Stryker

Corp.*, 308 So. 3d 149, 154 (Fla. 4th DCA 2020)). Under the risk utility test—which balances the

danger against the benefits—six factors are utilized to determine whether a product's risk

outweighs its utility to the customer: (1) the likelihood/gravity of potential injury balanced against

its utility; (2) the availability of other safe products to meet the same need; (3) the obviousness of

the danger; (4) public knowledge or expectation of the danger; (5) the adequacy of instructions

and warnings; and (6) the ability to eliminate or minimize the danger without impairing the product

or making it too expensive. *Id.* at 8–9.

Whether proceeding under either test, Defendant argues that there is no evidence

establishing a defective design. Specifically, under the consumer expectations test, Defendant

11

argues that "[a]n ordinary consumer certainly could appreciate the risk associated with falling from a Onewheel" and that Plaintiff therefore understood that risk. *Id.* at 8. Under the risk utility test, on the other hand, Defendant maintains that "[e]ven if Plaintiff's experts['] opinions were admissible, Plaintiff's experts fail to provide evidence that meet[s] the six factors." *Id.* at 9.

Third, as to its argument that Plaintiff cannot establish a warning defect, Defendant notes that to establish a prima facie case of defective warning, Plaintiff must prove that Defendant is the manufacturer or distributor of the product at issue, that Defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution, and that the failure to warn was the proximate cause of the plaintiff's injuries. *Id.* at 9–10.  That said, Defendant argues "the undisputed evidence is that Future Motion warned and instructed Plaintiff on the safe and proper operation of the Onewheel+" and that Plaintiff "admitted he understood the owner's manual's instructions on pushback and warnings to heed pushback and that it was important to heed those instructions." *Id.* at 10. But in any event, "[e]ven if Plaintiff were able to show that the various warnings through multiple mediums were not adequate, his claim for defective warning would still fail as he has not and cannot establish the allegedly inadequate warnings were the proximate cause of his injury." *Id.*

Fourth, as to its argument that Plaintiff cannot establish a manufacturing defect, Defendant notes that under Florida law, Plaintiff "must prove the product departed from its intended design such that it failed to perform as safely as the intended design would have performed," and must demonstrate that the manufacturing defect existed at the time the product left Defendant's plant. *Id.* at 11. On this matter, Defendant argues that Plaintiff "has not offered any evidence that a manufacturing defect existed in the Subject Onewheel" as opposed to general Onewheel products.

*Id.* Moreover, Defendant points out that "Plaintiff purchased the Subject Onewheel secondhand and cannot show that upon departing from Future Motion's plant, after thorough testing, the Subject Onewheel was defective." *Id.* at 11–12.

Finally, as to Defendant's argument that Plaintiff cannot establish that any alleged defect was the proximate cause of Plaintiff's injury, Defendant argues that "[t]he evidence in this case has established that the Subject Onewheel operated perfectly when it was test ridden as part of the manufacturing process and again when it was inspected after the accident." *Id.* at 12. And, as to Plaintiff's claims for negligence, Defendant briefly argues that "[e]ven under a negligence theory, a plaintiff must first prove a defect and then show the defect caused injury." *Id.* at 12–13. In this regard, Defendant argues that Plaintiff "cannot present any evidence that would tend to show that the Subject Onewheel contains a defect or any evidence that an alleged defect caused Plaintiff's injuries." *Id.* at 13. Defendant also argues that there is no evidence of negligent conduct by Defendant. *Id.*

    b.  <u>Plaintiff's Response [DE 70]</u>

Plaintiff begins by arguing that product liability cases under Florida law require proof of two things—that the product is defective, and that said defect caused the plaintiff's injuries. [DE 70 at 4]. Plaintiff then notes that a product may be defective by virtue of a design defect, manufacturing defect, or inadequate warning. *Id.* Accordingly, in the instant case, Plaintiff asserts that the Onewheel+ was defective "due to its design and inadequate warnings." *Id.* at 5. To the extent Plaintiff also alleged a manufacturing defect in his Complaint, Plaintiff states that he is withdrawing all such allegations. *Id.* at 5.

Specifically, with respect to a design defect, Plaintiff argues that under both the consumer expectations test and the risk utility test, "the evidence establishes that there exist issues of fact."

*Id.* As to the consumer expectations test, Plaintiff argues that "it is clear that 'normal use' of the Onewheel+ would be for it to transport the rider" and that "[t]he product ceasing to balance [P]laintiff . . . and going nose-down to the ground without pushback warning as testified by [P]laintiff, would be a malfunction of . . . normal use precluding summary judgment." *Id.* at 6–7. Moreover, to the extent that Defendant briefly argued the Onewheel+ was too "complex" for application of the consumer expectations test, Plaintiff argues "[t]hat the Onewheel+ is a complex piece of machinery does not defeat [the expectation that it will not cease balancing a rider while in motion], nor does it insulate a defendant from a jury's determination of whether its design is defective." *Id.* at 7. Further, as to the risk utility test, Plaintiff contends "[t]he evidence clearly shows that a balancing of such factors weighs in favor of risk outweighing utility, but [that regardless,] any such balancing test raises issues of fact that [a]re the province of the jury." *Id.* at 8.

Next, as it pertains to inadequate warnings, according to Plaintiff, "there are clear issues of fact as to whether the warnings provided by defendant were deficient and, if so[,] whether they proximately caused plaintiff's injuries." *Id.* at 10. In this regard, Plaintiff notes that his incident "did not occur as a result of any . . . scenario presented in the user manual." *Id.* As stated by Plaintiff, "[i]t is an issue of fact for the jury whether this plaintiff, who describes himself as 'risk-averse' . . . and quite knowledgeable about the product . . . would have accelerated in a different manner on the day of the incident if he knew that rapid acceleration alone could cause the board to cease balancing him." *Id.* at 11. Moreover, Plaintiff argues that "Defendant is indeed the manufacturer and distributor of the Onewheel+, and [that] questions of fact exist as to adequacy of warnings and their [e]ffect on [P]laintiff." *Id.* at 11.

14

Thereafter, in response to Defendant's argument concerning Plaintiff's experts, Plaintiff argues that "unless [P]laintiff's experts are precluded from testifying at trial because each and every one of their conclusions are deemed inadmissible, [P]laintiff will support his defective design and defective warnings arguments, . . . with the requisite expert support." *Id.* at 12. In connection therewith, Plaintiff argues that his experts "conclude that [D]efendant's manual does not warn against the circumstances attendant to [P]laintiff's accident, that [P]laintiff's incident could have been mitigated by adding small wheels to the front of the board, or by designing software to bring the board to a stop in a controlled fashion, and by the addition of visual or audible warnings." *Id.* Moreover, Plaintiff's experts "have found examples in the Onewheel+ source code of choosing equipment preservation over rider safety . . . and opined as to statistical error rates in the code that would be present and that the consequence of those errors could lead to loss of stability of the board and potential harm to the rider." *Id.* (internal quotation marks omitted). Thus, according to Plaintiff, "[i]f [P]laintiff's experts are able to testify on just one of the myriad of points raised in their expert reports[,] . . . [P]laintiff will possess the requisite expert support to establish both design and warnings defects." *Id.* at 13.

Finally, Plaintiff briefly argues that issues of fact preclude summary judgment as to negligence. After noting the difference between Plaintiff's strict liability and negligence claims—that is, that in order to demonstrate negligence, Plaintiff must "show that [the aforementioned] defects were due to [D]efendant's negligence"—Plaintiff argues that "[i]ssues of fact exist as to whether [D]efendant satisfied its duties pursuant to the Failure Modes and Effects Analysis (FMEA)." *Id.* As stated by Plaintiff, "there exists no proof that [D]efendant provided written warnings on torque-based loss of control, or torque-based pushback" which "means that

[D]efendant was either negligent in their FMEA analysis by understanding the torque-based hazard, or negligent in failing to warn their users of the same." *Id.* at 14.

c.  Defendants' Reply [DE 85]

In Defendant's Reply, Defendant first argues that Plaintiff fails to identify any evidence in the record of a design or warning defect that Plaintiff alleges caused the incident. [DE 85 at 1]. More specifically, Defendant argues that "Plaintiff merely reiterates the conclusions drawn by his experts without addressing the critical gap between the purported alternative designs or statistical probabilities his experts discuss and an expert opinion that there was an alleged defect in the Onewheel+ that caused this incident." *Id.* at 1–2. Thus, "[b]ecause there is no competent expert testimony that the Subject Onewheel contains an unreasonably dangerous defect, and no expert testimony that any alleged defect within the Subject Onewheel caused this incident, summary judgment is warranted." *Id.* at 2.

Next, Defendant argues that Plaintiff cannot establish a basis for his design defect claim. *Id.* After arguing that the consumer expectations test does *not* apply—because the Onewheel+ is more complex than a seatbelt, which the case relied upon by Plaintiff considered to be "on the cusp" of complex—Defendant argues that "[e]ven if the Court determined the Consumer Expectations Test applied, Plaintiff has still not shown a basis for a design defect claim, as a reasonable user would understand the risk of falling off a Onewheel+." *Id.* at 2–4. Moreover, Defendant states that, "[e]ven assuming Plaintiff's use of the Onewheel+ was a 'normal use,' despite Plaintiff's own statements on social media, he has still not presented facts showing a 'malfunction' occurred." *Id.* at 5.

Defendant also argues that Plaintiff fails to show an issue of fact exists to establish a design defect under the risk utility test. *Id.* at 5. To this end, Defendant notes that "[i]nstead of offering

expert opinions or reports to create an issue of fact or prove a design defect under the factors to be considered under the risk utility test, Plaintiff instead makes statements with no citation or reference to any actual facts." *Id.* Thus, Defendant argues Plaintiff "cannot create an issue of fact and defeat summary judgment without any evidence in the record." *Id.*

Subsequently, turning to inadequate warnings, Defendant argues Plaintiff has not presented facts or expert opinion that the warnings or absence of warnings was the proximate cause of Plaintiff's injury. *Id.* at 6. In this regard, Defendant states: "As is clear in the record and as acknowledged by Plaintiff, Future Motion provided a myriad of warnings on various mediums. . . . However, even if Plaintiff had shown that these warnings were inadequate, Plaintiff has not provided any evidence nor expert opinion showing the failure to warn was the proximate cause of Plaintiff's injury. Instead of addressing this issue with facts or expert opinion in his memorandum, Plaintiff simply states that a fact issue exists." *Id.*

As to Plaintiff's allegations concerning a manufacturing defect, Defendant notes that Plaintiff has "withdrawn" any claims of a manufacturing defect and does not address Future Motion's summary judgment motion on that basis. *Id.* at 7. Defendant therefore argues that Plaintiff's "strict liability and negligence claims premised upon an alleged manufacturing defect must be dismissed as a matter of law." *Id.*

Finally, Defendant argues Plaintiff cannot provide any evidence showing Future Motion's negligence was the proximate cause of Plaintiff's injury, and that Plaintiff's negligence claim must therefore be dismissed. *Id.* Indeed, after noting that Plaintiff states an issue of fact exists related to the Failure Modes and Effects Analysis ("FMEA"), Defendant argues that "[t]here is no legal authority to . . . suggest that FMEA imposes a particular duty onto Future Motion." *Id.*

## V.     RELEVANT LAW AND ANALYSIS

With respect to strict liability, Defendant's Motion for Summary Judgment focuses on five major arguments: (1) that Plaintiff lacks competent expert testimony necessary to establish a defect in the Onewheel+; (2) that Plaintiff cannot establish a design defect; (3) that Plaintiff cannot establish a warning defect; (4) that Plaintiff cannot establish a manufacturing defect; and (5) that Plaintiff cannot establish that any purported defect was the proximate cause of his injuries. Moreover, with respect to negligence, beyond being unable to present any evidence of a defect, Defendant contends that Plaintiff cannot prove that any defect was due to its negligence. The Court will address Defendant's arguments pertaining to strict liability and negligence below.[4]

a.   <u>Strict Liability</u>

"In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80, 87 (Fla. 1976). "A product may be defective by virtue of design defect, manufacturing defect, or an inadequate warning." *Liggett Grp., Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. 4th DCA 2007).

Here, it is undisputed that Defendant Future Motion, Inc. is the creator and manufacturer of the Onewheel+. [Def.'s SMF ¶ 2]. Therefore, strict liability in the instant case turns on the existence of a defect and the unreasonably dangerous condition of the product, and the proximate causal connection between such condition and Plaintiff's injuries. The Court will necessarily

---

[4] To the extent the arguments contained within Defendant's Motion for Summary Judgment do not address any other allegations contained within Plaintiff's Complaint, the Court finds that Defendant has waived disputing such allegations at the summary judgment stage.

address these issues while covering Defendant's five arguments on summary judgment identified above.

### 1. Competent Expert Testimony

"Federal courts applying Florida law have held that expert testimony is necessary to prove a product is defective." *Eghnayem v. Bos. Sci. Corp.*, No. 14-cv-024061, 2016 WL 4051311, at *6 (S.D. Fla. Mar. 17, 2016); *Penick v. Harbor Freight Tools, USA, Inc.*, No. 19-cv-23134, 2020 WL 6581606, at *5 (S.D. Fla. Nov. 10, 2020) ("Defects, moreover, 'must be proven by expert testimony.'") (citing *Fagundez v. Louisville Ladder, Inc.*, No. 10-23131-CIV, 2011 WL 6754089, at *2 (S.D. Fla. Dec. 22, 2011), *report and recommendation adopted*, 2012 WL 12844303 (S.D. Fla. Jan. 19, 2012)).

In the instant case, Defendant relies upon argument set forth in its Motion to Exclude the Testimony of Plaintiff's Named Experts David Rondinone and Derek King [DE 58] as part of its assertion that Plaintiff has "failed to produce admissible expert evidence demonstrating a product defect." [DE 52 at 5]. However, in the Court's Order Granting in Part and Denying in Part Defendant's Motion to Exclude the Testimony of Plaintiff's Named Experts David Rondinone and Derek King—entered in conjunction with this Order—the Court found that certain opinions of Dr. David Randinone and Mr. King are admissible at trial. Those admissible opinions contend that the Onewheel+ was defective due to its design and inadequate warnings, and suggest alternative designs with actual real-world applications. Thus, at this juncture, the Court finds that Plaintiff has set forth competent expert testimony necessary to establish a product defect, and consequently, that there exist genuine issues of material fact as to the existence of a product defect. *See Fagundez*,

2011 WL 6754089, at *2 ("The undersigned denied the defendant's motions to exclude these experts. Thus, the plaintiff has sufficient record evidence to demonstrate the existence of genuine issues of material fact.").

### 2. Design Defect

"The definition of design defect is in a state of flux in Florida." *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1270 (S.D. Fla. 2020) (alteration omitted) (quoting *In re Standard Jury Instructions in Civil Cases—Report No. 09–10 (Prods. Liab.)*, 91 So. 3d 785, 789 (Fla. 2012) (Pariente, J., concurring)). "Courts commonly use one of two tests to determine if a product is defectively designed: the consumer expectation test and the risk utility test." *Messina v. Ethicon, Inc.*, No. 20-cv-1170-PGB-LRH, 2021 WL 1329072, at *4 (M.D. Fla. Mar. 31, 2021). "Put differently, when a plaintiff asserts a defect in the product's design, unreasonable dangerousness is determined by applying the consumer-expectations test . . . , the risk-utility test . . . , or both." *Eghnayem*, 2016 WL 4051311, at *4. A plaintiff may prevail on a design defect claim by utilizing either the consumer expectations test, or the risk-utility test. *Pierre*, 476 F. Supp. 3d at 1270. However, regardless of which test is utilized, "[w]hether a product is unreasonably dangerous is normally a question for the jury." *Norton v. Snapper Power Equip, Div. of Fuqua Indus., Inc.*, 806 F.2d 1545, 1548 (11th Cir. 1987).

"Under the consumer expectations test, a product is considered to be defective 'where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to [the consumer]." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 513 (Fla. 2015) (quoting Restatement (Second) of Torts § 402A cmt. g. (1965)). "The consumer expectations test 'considers whether a product is unreasonably dangerous

20

in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner.'" *Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 154 (Fla. 4th DCA 2020) (quoting *Aubin*, 177 So. 3d at 503). Stated differently, the test "relies on deductive reasoning to conclude that the produce is defective." *Force v. Ford Motor Co.*, 879 So. 2d 103, 106 (Fla. 5th DCA 2004). However, "[a]lthough Florida courts generally continue to rely on the consumer-expectation test, some courts have observed that 'there may . . . be products that are too complex for a logical application of the consumer-expectation standard." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1339 (M.D. Fla. 2015) (quoting *Force*, 879 So. 2d 103 at 105).

In contrast, under the risk-utility test, "[a] product is considered unreasonably dangerous . . . if the risk of danger in the design outweighs the benefits." *Pierre*, 476 F. Supp. 3d at 1271. Specifically, that test requires an analysis of several factors, such as:

> the likelihood of potential injury, the gravity of potential injury, the product's usefulness, the availability of a safer product which meets the same needs, the obviousness of the danger posed by the product, the level of danger ordinarily expected in the product by the public, the sufficiency of instructions and warnings which accompany the product, and the availability of an alternative design which would reduce or eliminate the danger posed by the product without significantly sacrificing the product's usefulness or making the product unduly expensive.

*Anderson v. Techtronic Indus. N. Am., Inc.*, No. 13-cv-1571-Orl-40TBS, 2015 WL 7429060, at *3 (M.D. Fla. Nov. 23, 2015). "While the [Florida Supreme Court] concluded that 'the Third Restatement's risk utility test and establishment of a reasonable alternative design mandate are not requirements for finding strict liability,' the court explained that nothing precludes the parties from presenting evidence concerning whether 'a reasonable alternative design existed' and 'whether the benefit of the product's design outweighed any risks of injury or death caused by the design.'" *Cavanaugh*, 308 So. 3d at 154–55 (quoting *Aubin*, 177 So. 3d at 511–12).

In the instant case, whether proceeding under either the consumer expectations test or the risk-utility test, the Court finds that genuine issues of material fact remain as to whether a design defect in the Onewheel+ exists. As stated above, the Court has already found that certain opinions of Dr. David Randinone and Mr. King are admissible at trial, with said opinions concluding that the Onewheel+ was defective due to its design, as certain alternative designs could have been implemented which would have mitigated Plaintiff's risk of injury. Therefore, because Plaintiff has advanced expert testimony sufficient to establish a design defect (albeit subject to vigorous cross-examination at trial), issues concerning: (1) whether the product is unreasonably dangerous under the consumer expectations test because it failed to perform as safely as an ordinary consumer would expect; or (2) whether the product is unreasonably dangerous under the risk-utility test because a reasonable alternative design existed, become questions for the jury to decide. *See Norton*, 806 F.2d at 1548. Accordingly, to the extent Defendant argues that Plaintiff has failed to establish a genuine issue of material fact as to whether a design defect exists, Defendant's Motion for Summary Judgment must be denied.[5]

### 3. Warning Defect

"To prevail on a claim of strict liability for failure to warn, a plaintiff must prove (1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact suffered an injury from using the product." *Eghnayem*, 2016 WL 4051311, at *9 (citing *Hoffman-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009)). "'While in many instances the adequacy of warnings is a question of fact,' the Florida Supreme Court has held that 'it can become a question of law where the warning is accurate, clear, and unambiguous.'"

---

[5] Causation as it relates to a design defect is addressed separately in Section (V)(a)(5) below.

*Id.* (alterations omitted) (quoting *Felix v. Hoffman-LaRoche, Inc.*, 540 So. 2d 102, 105 (Fla. 1989)). Additionally, a "manufacturer has a strict duty to warn of its product's dangerous propensities only in those instances where the commodity is inherently dangerous. . . . Whether or not a manufacturer should have warned the consumer of a product's dangerous propensities is ordinarily a question for the jury based upon the manufacturer's foreseeability of injury to the consumer." *Penick*, 2020 WL 6581606, at *6 (quoting *Brito v. County of Palm Beach*, 753 So. 2d 109, 112 (Fla. 4th DCA 1998)).

Here, there is little question that an electric skateboard is inherently dangerous, and it is undisputed that the owner's manual for the Onewheel+ contains many warnings about the Onewheel+ board and how to use it, as well as warnings about the board's "pushback" feature. [Def.'s SMF ¶¶ 26–27]. As noted earlier, this includes the following warnings: (1) that, if at any time a rider attempts to go too fast, descends a very steep hill, or rides with a low battery, the Onewheel+ will "push back"; (2) that, in a situation where the board "pushes back," the nose of the board will lift to slow the rider down, after which the only way of avoiding so-called "pushback" is for the rider to decrease his or her speed by leaning back; and (3) that ignoring safety warnings—including warnings concerning pushback—may result in loss of control, serious injury, or death. [Def.'s SMF ¶ 26]. Further, it is also undisputed that the owner's manual for the Onewheel+ describes situations where loss of control is possible, such as low-battery, full-battery while riding downhill, exceeding speed limitations, or riding down too steep of a hill, with nose-down ground contact as the consequence. [Pl.'s Resp. SMF ¶ 69].

However, Plaintiff testified that the conditions under which he fell did not include any situation that was said to trigger pushback. In other words, Plaintiff testified that his fall was not the result of exceeding the speed limit, going downhill with a full battery, having a low battery, or

going down a steep hill. [DE 53-1 at 90:3–24]. Plaintiff also testified that he did not experience pushback prior to the board purportedly ceasing to balance. *Id.* at 106:17–23. And, Plaintiff testified that he was not aware of any acceleration related limits pertaining to the Onewheel+. *Id.* at 98:21–99:1. Based on this evidence—combined with an expert opinion that the absence of pushback during the incident indicated an unanticipated or non-disclosed issue[6]—there exists a genuine issue of material fact as to the adequacy of Defendant's warnings, as any warning included in the owner's manual did not communicate the danger of torque-based acceleration or an unanticipated issue. *See Penick*, 2020 WL 6581606, at *7 ("Despite the warnings contained in the owner's manual, both parties agree that the manual does not expressly warn against opening the cap to the gas tank while the generator is running. . . . Against this backdrop, Plaintiff has testified that he would not have opened the cap while the generator was running had he known not to open it. Accordingly, Plaintiff has produced evidence supporting a failure to warn claim.") (internal citations omitted); *see also Pinchinat v. Graco Children's Prods., Inc.*, 390 F. Supp. 2d 1141, 1146 (M.D. Fla. 2005) ("The sufficiency and reasonableness of . . . warnings are questions of fact best left for the jury unless the warnings are accurate, clear, and unambiguous."). Thus, to the extent Defendant argues that Plaintiff has failed to establish a genuine issue of material fact as to whether a warning defect exists, Defendant's Motion for Summary Judgment must be denied.[7]

    4. <u>Manufacturing Defect</u>

"Failure to respond to an argument seeking summary judgment constitutes abandonment of that argument and warrants the entry of summary judgment." *Pecora v. Prime Sec. Alliance, Inc.*, No. 20-cv-24478, 2022 WL 19302229, at *7 (S.D. Fla. Mar. 3, 2022). Here, Plaintiff has

---

[6] DE 58-1 at 288.
[7] Causation as it relates to a warning defect is also addressed separately in Section (V)(a)(5) below.

failed to respond to Defendant's argument in its motion for summary judgment as it pertains to a manufacturing defect. In fact, Plaintiff himself states that he is "withdraw[ing] any claims of a manufacturing defect and will not address that portion of [D]efendant's motion which argues for summary judgment on such basis." [DE 70 at 5]. Thus, Defendant's Motion for Summary Judgment is necessarily granted as to Plaintiff's manufacturing defect theory.

    5.  <u>Causation</u>

"To prove causation under a strict products liability theory, a plaintiff must prove that the product defect proximately caused his injury." *Pierre*, 476 F. Supp. 3d 1260, 1274 (S.D. Fla. 2020) (quoting *Rink v. Cheinova, Inc.*, 400 F.3d 1286, 1295 (11th Cir. 2005)). "Regarding proof of causation, in complex cases where a jury is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required." *Id.* (alteration omitted) (quoting *Small v. Amgen, Inc.*, 723 F. App'x 722, 726 (11th Cir. 2018)). "Without expert testimony in such complex cases, the plaintiff's claim fails as a matter of law." *Pierre v. Intuitive Surgical, Inc.*, 854 F. App'x 316, 320 (11th Cir. 2021). However, in ordinary cases, "[t]he question of proximate cause is for the jury unless reasonable persons could not differ in their determination of the question." *Riley v. Tesla*, No. 20-CV-60517, 2022 WL 2341165, at *1 (S.D. Fla. June 29, 2022). Indeed, "[u]nder Florida law, the question of proximate cause, being factual in nature, must be submitted to the jury." *McLeod v. Am. Motors Corp.*, 723 F.2d 830 (11th Cir. 1984).

In the instant case, the Court finds on the current record for purposes of summary judgment that operation of the Onewheel+ and issues in connection therewith—including whether the product failed to perform as safely as an ordinary consumer would expect or whether a reasonable alternative design existed under either the consumer expectation test or the risk-utility test, respectively, and whether Defendant's warnings were sufficient in light of Plaintiff's testimony

that he fell under conditions for which pushback was not contemplated or warned against—do not necessarily implicate any complex medical or scientific issues. *See Pierre*, 476 F. Supp. 3d at 1274. Simply stated, this is a case involving operation of an electric skateboard, and seemingly a layperson would arguably be able to determine certain issues surrounding safety, reasonable alternative designs, and the adequacy of warnings. *Cf. Force*, 879 So. 2d at 110 (finding that seatbelts were not too complex for a logical application of the consumer-expectation standard). Thus, to the extent Defendant takes issues with Plaintiff's experts not specifically stating that the design and warning defects referenced above caused Plaintiff's injuries, the lack of such an explicit statement is not fatal at this summary judgment juncture, as "the issue of proximate cause is [normally] a question of fact left for the finder of fact." *Sunbelt Env't, Inc. v. Gulf Coast Truck & Equip. Co.*, 82 So. 3d 1196, 1200 (Fla. 1st DCA 2012).

b.  Negligence

Under Florida law, the elements of a negligence cause of action in a products liability case are: (1) "the manufacturer must have a legal duty to design and manufacture a product reasonably safe for use"; (2) "the manufacturer must fail to comply with that duty"; (3) "the plaintiff must have an injury that is legally caused by the manufacturer's breach of duty;" and (4) the plaintiff must have suffered damages." *Anderson v. Techtronic Indus. N. Am., Inc.*, No. 13-cv-1571-Orl-41TBS, 2015 WL 12843836, at *8 (M.D. Fla. Apr. 14, 2015) (alterations omitted). "[T]o prevail in a products liability case for . . . negligence . . . , the plaintiff must establish a defect in the subject product." *Penick*, 2020 WL 6581606, at *5. Moreover, "[t]o establish causation sufficient for a negligence claim in a products liability case, the plaintiff must prove by a preponderance of the evidence that his injury was proximately caused by the manufacturer's breach of its duty to produce a product reasonably safe for use." *Rink*, 400 F.3d at 1295.

Unlike strict liability—which "is not concerned with the reasonableness of a manufacturer's conduct" and focuses instead "on the product itself and the reasonable expectations of the consumer"—under a negligence theory, "the focus is on . . . whether a duty of care was owed to the injured parties, and whether the defendants breached that duty of care." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 18 (Fla. 4th DCA 2022) (quoting *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1370 (S.D. Fla. 2012) and *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1287 (M.D. Fla. 2009)). In this regard, "Florida law imposes a broad duty of care in the negligence context." *Jennings v. BIC Corp.*, 181 F.3d 1250, 1257 (11th Cir. 1999).

Specifically, "Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *Id.* (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992)). "As to duty, the proper inquiry . . . is whether the defendant's conduct created a foreseeable zone of risk, not whether the defendant could foresee the specific injury that actually occurred." *McCain*, 593 So. 2d at 504. "To determine whether the risk of injury to a plaintiff is foreseeable under the concept of duty, courts must look at whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility." *Grieco*, 344 So. 3d at 23. And more specifically, in the products liability context, "[t]here is no doubt whatever that the manufacturer is under a duty to use reasonable care to design a product that is reasonably safe for its intended use and for other uses which are foreseeably probable." *Light v. Weldarc Co., Inc.*, 569 So. 2d 1302, 1303 (Fla. 5th DCA 1990) (citation omitted).

Here, because there is significant overlap between strict liability and negligence, and because the Court has already found that genuine issues of material fact remain as to Plaintiff's claims for a design defect and warning defect (including issues involving causation), for purposes

27

of negligence, the Court need only examine whether Defendant owed a duty of care to Plaintiff, and whether Defendant breached that duty of care. To this end, like the court in *Light*, the Undersigned notes that there is no question that Defendant owed a duty of care to Plaintiff to design the Onewheel+ to be reasonably safe for its intended use. However, whether Defendant breached that duty of care without additional safety elements built in, and whether the Onewheel+ *was* actually reasonably safe for its intended use, are questions of fact precluding summary judgment—at least, assuming Plaintiff has put forth sufficient evidence. *See id.* ("Whether Weldarc breached its duty of care in designing the glasses without some type of 'anti-slip' safety device and whether the glasses, as designed, were reasonably safe for their intended use are questions of fact precluding summary judgment.").

In the instant case, Plaintiff argues that the Failure Modes and Effects Analysis—which has the objective of "systematically list[ing], rank[ing], classify[ing], and assess[ing] failures according to their effect on mission success and the safety of personnel and equipment"—creates "at the very least an issue of fact [such that his claim for negligence] . . . should not be summarily denied." [DE 70 at 13–14]. Relying upon the FMEA, which is itself premised upon first designing out known risks or hazards and then either guarding against the hazard or warning about the hazard as a last resort, Plaintiff utilizes the testimony of Erik Doerksen (Defendant's founder and CEO) to illustrate this point. Mr. Doerksen essentially testified that the Onewheel+ was designed using FMEA principles. *See* DE 70-1 at 4:15–25. Thus, combined with Mr. Doerksen's testimony that "[t]here are failures that could happen in the electronics of the device . . . [which] could cause hazards," Plaintiff argues that Defendant was either "negligent in [its] FMEA analysis by [failing to understand] the torque-based hazard [at issue in the instant case], or negligent in failing to warn their users of the same." [DE 70 at 14].

28

Although this evidence is minimal, the Court finds it sufficient to establish a genuine issue of material fact as to whether Defendant was negligent under the circumstances of this case. Indeed, that Plaintiff's experts did not conclude Defendant was negligent in conducting the FMEA is not conclusive because, as noted above, the Court finds that here, expert testimony is not necessary to ascertain issues related to a design or warning defect. Moreover, to the extent Defendant argues that Plaintiff "only argues his negligence theory in relation to warnings in his memorandum of law," Plaintiff's utilization of language that Defendant was "*either negligent in their FMEA analysis by [failing to] understand[] the torque-based hazard,* or negligent in failing to warn their users of same" demonstrates otherwise. *See* DE 70 at 14. Thus, Defendant's Motion for Summary Judgment is due to be denied as to all design defect and warning defect claims sounding in negligence.[8]

## VI.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [DE 52] is **GRANTED IN PART AND DENIED IN PART**. Specifically, Defendant's Motion for Summary Judgment is **GRANTED** as to Counts I and II with respect to Plaintiff's strict liability and negligence claims based on a manufacturing defect. However, Defendant's Motion for Summary Judgment is **DENIED** as to Counts I and II with respect to Plaintiff's strict liability and negligence claims based on a design defect or warning defect.

This case shall proceed to jury trial on the remaining claims at 9:00 a.m. on May 15, 2023, and the parties and their counsel are directed be personally present in court at the West Palm Beach

---

[8] However, as with strict liability, Defendant's Motion for Summary Judgment is due to be granted as to any negligence claim based on a manufacturing defect, as Plaintiff has abandoned any manufacturing defect claim.

Federal Courthouse, Courtroom 2, Fourth Floor, at 8:30 a.m. on May 15, 2023. The calendar call shall be held at 1:00 p.m. on May 10, 2023, at the West Palm Beach Federal Courthouse, Third Floor, Courtroom Six, West Palm Beach, Florida.[9] All counsel must appear in person at the calendar call. During the calendar call, the Court will conduct a hearing on Defendant's Motion in Limine to Exclude Evidence of the Visual Alert and Safety Beep as a Subsequent Remedial Measure [DE 54], Defendant's Motion in Limine to Exclude Evidence of CSPC-Related Evidence as Irrelevant Hearsay [DE 55], and Defendant's Motion in Limine to Exclude Evidence of Other Incidents [DE 56].

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 2nd day of May, 2023.

WILLIAM MATTHEWMAN
United States Magistrate Judge

---

[9] The Court notes that this is now a *different* courtroom from which the trial will be held. Moreover, the calendar call shall now be held at 1:00 p.m. instead of 2:00 p.m. It shall also be held in-person in the Courthouse and not by Zoom VTC.